# UNITED STATES DISTRICT COURT

# MIDDLE DISTRICT OF LOUISIANA

**UNITED STATES OF AMERICA**

**VERSUS**

**MALCOLM J. JACKSON, a.k.a. "Fish"**

**CRIMINAL ACTION**

**NO. 19-152-JWD-EWD-4**

## RULING AND ORDER

## I.    INTRODUCTION

This matter comes before the Court on two motions to suppress filed by Defendant Malcolm J. Jackson, a.k.a. "Fish" ("Defendant").  The first *Motion to Suppress and Evidence* [sic] (Docs. 120, 187) involves the March 12, 2019, search of Defendant's home in Plaquemine, Louisiana, by the Iberville Parish Sheriff's Office ("IPSO").  This motion will be referred to as the *Home MTS* or *HMTS*.  The *Second Motion to Suppress Statement and Evidence* (Doc. 147) involves the April 26, 2019, search of Defendant's truck by the IPSO (working in conjunction with federal agents).  It will be called the "*Vehicle MTS*" or "*VMTS*."  Both motions were initially briefed. (Docs. 120-1, 125, 187, 190, for the *HMTS*, and Docs. 147-1, 153, for the *VMTS*).

Thereafter, an evidentiary hearing was held for each motion—on August 3, 2022, for the *Vehicle MTS*, (Doc. 184), and November 8, 2022, for the *Home MTS*, (Doc. 195). Next, transcripts were filed. (Docs. 189 for the *VMTS* ("VM Tr."), and Doc. 198 for the *HMTS* ("HM Tr.").) Later, further briefing was submitted on the *Vehicle MTS*, (Docs. 191, 203, 206, 208), and *Home MTS*, (Docs. 204, 205, 209).

The parties do not really dispute the law to be applied for each of the instant motions; rather, they hotly contest the facts and the inferences and conclusions to be drawn from undisputed

evidence and videos.  Thus, much of the outcome of the motions will be determined by the Court's resolution of these factual questions.

The Court carefully listened to the testimony at the hearings and observed the demeanor of the witnesses; has thoroughly reviewed the transcripts, extensive briefing, evidence, and law; and is now prepared to rule.  For the following reasons, both motions are denied.

## II.  THE *HOME MTS*

### A.  Relevant Factual Background

This is a drug case.  Defendant and four others are charged in Count 1 of a four-count Indictment with conspiracy to distribute and possess with intent to distribute 500 grams or more of cocaine and 28 grams or more of cocaine base. (Doc. 1 at 1–11.)  Further, Defendant is charged with possession of a firearm in furtherance of a drug trafficking offense (Count 2) and possession of a firearm by a convicted felon (Count 3). (*Id.* at 11–12.)

As indicated above, the *Home MTS* involves two radically different versions of what happened during a March 12, 2019, search of Defendant's residence by members of the IPSO.  On the one hand, the Government's version is as follows: Sergeant Randy Vinson (1) received reports of a 911 call alleging a domestic dispute; (2) arrived on the scene (a) to hear screaming in the house and (b) to see an African-American female by the roadway saying "he's beating her ass in there;" and (3) "smelled a strong odor of marijuana coming from the home[.]" (HM Tr. at 33–35, 43.)  When Vinson reached the house, he saw Defendant and his wife screaming at and arguing with one another. (*Id.* at 36, 51.)  The Jacksons told Vinson to leave, began screaming at him, and did not comply with his instructions for them to separate. (*Id.* 36–40.)  At some point (either from the door or upon entry), Vinson saw "some digital scales in the kitchen that had some white residue on them and a torn baggy." (*Id.* at 43, 47–48, 50, 54.) Vinson's account is primarily corroborated

by Detective Jeremy Sanchez, who arrived on the scene shortly after Vinson. (*See id.* at 56–60, 63–64.)  Other officers (including Nicholas Engolio and Zane Hebert) later came, the Jacksons were arrested, a warrant was obtained, and the house was searched, revealing evidence of the instant crimes. (*Id.* at 41, 71–72, 88–89.)

On the other hand, Defendant's version, as presented by his wife, is as follows: (1) the Jacksons were not having an argument, (*id.* at 12, 19); (2) they were not screaming or fighting, (*id.* at 20); (3) no one was physically injured or in need of medical care, (*id.* at 12, 31); (4) the situation was "very calm," (*id.* at 19); (5) it was impossible for Vinson or the other officers to see any weapon, drugs, or drug paraphernalia from the doorway of the house, (*id.* at 10, 21); (6) Defendant and his wife denied the officer's request to go outside, (*id.* at 12); and (7) the officers tried to convince Mrs. Jackson to "Just say he did it," and then threatened her when she refused, (*id.* at 15–16).

### B.  Parties' Arguments

The Court could spill much ink summarizing each of the briefs filed by the parties, but, for the sake of brevity, Defendant's position boils down to the following.  First, all evidence flowed from an illegal entry into the home that was not based on exigent circumstances or was otherwise justifiable. (Doc. 204 at 7–9.)  Moreover, that initial taint cannot be cured because, contrary to the narcotics' officers' testimony, it was impossible for them to see the scales and baggies from the front door of the residence, and their testimony was otherwise not credible. (*Id.* at 10–12.)

Second, Defendant maintains that the warrant contains material misrepresentations which, when removed, make the search unlawful. (*Id.* at 11.)  The warrant was based on (a) the smell of marijuana coming from the residence, and (b) the "two digital scales and box of plastic bags with a plastic bag hanging out of the box with the corner torn off," which, based on the officer's

"experience[,] is commonly used in the distribution of narcotics" and which was "observed in plain view on the kitchen counter[.]" (U.S. Ex. 2.)  But Defendant says that the three officers' statements that they smelled marijuana are speculative and unsupported, as there is no foundation as to how they knew what marijuana smelled like or otherwise establishing that they did in fact smell it. (Doc. 204 at 11–12.)  Additionally, again, it was impossible for the officers to observe the scales and baggies from the entryway to the door, so this too was a falsehood. (*Id.*)  Thus, the warrant application contains fatal lies, and all evidence flowing from it must be suppressed. (*Id.* at 12.)

On the other hand, the Government's argument boils down to the following.  First, even if the warrant contained a misrepresentation (i.e., that the drug paraphernalia was in plain view), then that lie can be omitted, and the warrant is still supported by probable cause. (Doc. 205 at 5–7.) Specifically, the officers' testimony that they smelled marijuana is an independent basis supporting the warrant. (*Id.*)

Second, the officer's conduct was reasonable. (*Id.* at 7–9.)  Vinson's and Sanchez's initial entry was justified by exigent circumstances both factually—based on the 911 call claiming Defendant had beat his wife up and saying she had bad asthma and couldn't breathe; the African-American woman outside Defendant's home saying, "he's beating her ass in there;" and the individuals inside screaming so loudly it could be heard from the streets—and legally, as caselaw supports the idea that officers have more leeway in responding to allegations of domestic violence. (*Id.*)

And third, credibility calls weigh in the Government's favor.  (*Id.* at 9–10.)  Ms. Jackson's testimony was not believable, as it contained multiple contradictions (e.g., the number of officers involved, the whereabouts of her kids, etc.) and implausibility (e.g., why her sister would have

called 911 for no reason). (*Id.*) Conversely, the Government relies upon four largely consistent accounts from police officers. (*Id.* at 10.)

### C. Discussion

Resolution of the *Home MTS* requires an analysis of two issues: (1) whether exigent circumstances justified entry into the home, and (2) whether the warrant contained lies, and whether any such lie or lies invalidated the search. Having carefully considered the matter, the Court finds, based on the highly credible testimony of Vinson and Sanchez, that (1) exigent circumstances justified entry into the residence, and (2) even if the narcotics officers lied about whether the scales and baggies were visible from the entryway of the house, the warrant still adequately showed probable cause based on the smell of marijuana from the residence.

#### *1. Exigent Circumstances*

##### *a.* Applicable Law

"Under the Fourth Amendment, a warrantless search of a person's home is presumptively unreasonable, and it is the government's burden to bring the search within an exception to the warrant requirement." *United States v. Aguirre*, 664 F.3d 606, 610 (5th Cir. 2011) (citing *Payton v. New York*, 445 U.S. 573, 586 (1980); *United States v. Gomez–Moreno*, 479 F.3d 350, 354 (5th Cir. 2007)). "Exigent circumstances is such an exception." *Id.* " It is available only on a showing by the government that the officers' entry into the home was supported by probable cause and justified by an exigent circumstance." *Id.* (citing *United States v. Jones*, 239 F.3d 716, 719 (5th Cir. 2001)). "[N]o amount of probable cause can justify a warrantless search or seizure absent [such] exigent circumstances." *Id.* (quoting *Horton v. California*, 496 U.S. 128, 137 n.7 (1990)). "In other words, even if the officers had probable cause to search the . . . home, they had to have exigent circumstances to enter without a warrant." *Id.*

"The government bears the burden of proving the existence of exigent circumstances." *United States v. Menchaca-Castruita*, 587 F.3d 283, 289 (5th Cir. 2009) (citing *United States v. Rodea*, 102 F.3d 1401, 1405 (5th Cir. 1996)). "Because it is essentially a factual determination, there is no set formula for determining when exigent circumstances may justify a warrantless entry." *Id.* (quoting *Untied States v. Blount*, 123 F.3d 831, 837 (5th Cir. 1997) (en banc)). "As a general rule, exigent circumstances exist when there is a genuine risk that officers or innocent bystanders will be endangered, that suspects will escape, or that evidence will be destroyed if entry is delayed until a warrant can be obtained." *Id.* (citing *Blount*, 123 F.3d at 837).

The Fifth Circuit has looked at the following non-exhaustive factors to determine the presence of exigent circumstances:

> (1) the degree of urgency involved and the amount of time necessary to obtain a warrant; (2) the reasonable belief that contraband is about to be removed; (3) the possibility of danger to the police officers guarding the site of contraband while a search warrant is sought; (4) the information indicating that the possessors of the contraband are aware that the police are on their trail; and (5) the ready destructibility of the contraband and the knowledge that efforts to dispose of it and to escape are characteristics in which those trafficking in contraband generally engage.

*Aguirre*, 664 F.3d at 611 (quoting *United States v. Mata*, 517 F.3d 279, 287 (5th Cir. 2008)). The Fifth Circuit has explained:

> The exigent circumstances analysis focuses upon the reasonableness of the officers' investigative tactics leading up to the warrantless entry. Our purpose is *not* to examine each act in isolation and inquire whether the officers *could* have acted differently. If "reasonable minds may differ" the courts should not second-guess the judgment of experienced law enforcement officers concerning the risks of a particular situation.

*Blount*, 123 F.3d at 838 (citing *United States v. Howard,* 106 F.3d 70, 76 (5th Cir. 1997)). *See also*

*Menchaca-Castruita*, 587 F.3d at 290 (quoting *Blount*, 123 F.3d at 838) (same).  Similarly, the

appellate court has also stated:

> [I]f we conclude that the officer's beliefs [that suspects were about to depart with evidence] were *reasonable*, based on his experience, knowledge, and observations at the time, then circumstances existed that justified or even required immediate action. On the other hand, if we conclude that [the officer] was unreasonable in believing, based on those same circumstances, that the suspects were preparing to depart with contraband, then there would have been no reasonable justification or need for the agents [to engage in a warrantless search].

*Menchaca-Castruita*, 587 F.3d at 290 (quoting *United States v. Rico*, 51 F.3d 495, 503 (5th Cir.

1995)).

Courts look at the totality of the circumstances in assessing whether the officer's beliefs

were reasonable. *See id.* at 296.  Further, "[i]n evaluating exigency, it must be borne in mind that

[courts] should consider the appearance of the scene of the search in the circumstances presented

as it would appear to reasonable and prudent men standing in the shoes of the officers." *Id.* at 290

(quoting *Blount*, 123 F.3d at 838).  As the Supreme Court stated: "[t]he calculus of reasonableness

must embody allowance for the fact that police officers are often forced to make split-second

judgments—in circumstances that are tense, uncertain, and rapidly evolving." *Kentucky v. King*,

563 U.S. 452, 466 (2011) (quoting *Graham v. Connor*, 490 U.S. 386, 396–397 (1989)).

The Supreme Court has held that "an important factor to be considered when determining

whether any exigency exists is the gravity of the underlying offense for which the arrest is being

made." *Welsh v. Wisconsin*, 466 U.S. 740, 753 (1984) (finding that warrantless entry into home to

arrest for civil traffic offense was a violation of the Fourth Amendment).  "Moreover, although no

exigency is created simply because there is probable cause to believe that a serious crime has been

committed, . . . application of the exigent-circumstances exception in the context of a home entry should rarely be sanctioned when there is probable cause to believe that only a minor offense . . . been committed." *Id.*

        *b.* <u>Analysis</u>

      Having carefully considered the matter, the Court finds that exigent circumstances justified entry into the home.  Again, the Court closely listened to all of the testimony at the hearing and observed the demeanor of each witness.  Based on those observations, the Court finds the following facts:

      Police received a 911 call from a concerned woman stating, "My sister just called me.  She says she can't breathe.  Her husband beat her up . . . Her husband name is Malcolm Jackson. . . . She can't breathe.  She has asthma real bad." [sic throughout] (U.S. Ex. 1 at 0:00–0:50.)  When Vinson and Sanchez approached Defendant's home, they heard screaming so loud that they could hear it from the street. (HM Tr. at 33–34, 63–64.)   Vinson and Sanchez also encountered an African-American woman outside the residence who said Ms. Jackson was in physical danger; specifically, the woman said, "He's beating her ass in there." (*Id.* at 33–34, 57–59.)  The officers tried to separate the two, but they were screaming and non-compliant (which is common in cases of domestic disputes). (*Id.* at 38–40, 58–60.)  In fact, Defendant was so uncooperative that Vinson had to draw his Taser on him. (*Id.* at 38, 60.)

      Given these facts, it was completely reasonable for Vinson and Sanchez to enter the residence to try to restore order and ensure everyone's safety.  As Vinson said, it was a very dynamic, fluid situation,[1] and he was concerned that the situation might re-escalate if he left

---

[1] The transcript uses the word "fluent," (HM Tr. 38, 47, 50), but the Court believes this was simply a misuse by Vinson.

without placing the two under arrest. (*Id.* at 38, 41, 47.)  And as Sanchez stated, this is what the officers "were trained to do in that situation;" they did not leave:

> because they were fighting and we needed to make sure everybody was safe . . . And we had a witness that - - First, we had a call saying somebody was being beat up in the house, and then we proceeded there and there was someone in the front yard saying the same thing. . . . [I]t was a very intense argument . . . If we'd walked away and he or she had killed someone, then we would have been negligent. We had to perform our duties.

(*Id.* at 59.)  The Court finds both of these statement (as well as Vinson and Sanchez's testimony as a whole) to be highly believable and very reasonable under the circumstances.

As a matter of fact, the Court agrees with the Government that Sanchez and Vinson's account is more believable than Ms. Jackson's.  Each of these witnesses has their bias—Mrs. Jackson as a spouse, and Vinson and Sanchez as law enforcement and the main subjects of this motion.  But, Sanchez and Vinson's testimony has added credibility by their willingness to concede points that are potentially harmful to their case, even if that contradicts the testimony of two fellow narcotics officers.  Specifically, both officers freely conceded that they may have viewed the scales after they entered into the residence. (*Id.* at 47–48, 50, 54, 62–63.)

Conversely, Ms. Jackson's testimony is undermined by (1) the lack of any explanation for why her sister would falsely report a domestic disturbance against Defendant, (*see id.* at 19); (2) her implausible statement that she never saw the digital scales before in her house, (*id.* at 30); and (3) Vinson's testimony that, in his experience, domestic violence victims are often uncooperative with law enforcement and defensive of the abuser (which is consistent with common knowledge on this topic), (*id.* at 39–40). Considering these facts (as well as the personal observation of each witness), the Court finds Sanchez and Vinson to be the more believable witnesses.

Additionally, as a matter of law, Defendant's authority does not entitle him to relief.  First, Defendant attempts to distinguish the Fifth Circuit decision of *Ceasar v. City of Eunice*, 642 F. App'x 387 (5th Cir. 2016) (per curiam), but the Court finds these efforts unpersuasive.  There, the police received a report of a domestic disturbance involving defendant and his girlfriend, and, on the way, the officers received a report that defendant had tried to fight with his girlfriend and had struck one of her family members. *Id.* at 388.  Defendant and his girlfriend shared an apartment, and officers made contact with him there. *Id.*  Defendant ignored the officers' commands and fled, and, following a search, they located him back at the apartment. *Id.*  He refused entry, so they broke down the door and arrested him. *Id.*

Defendant claimed on appeal that the warrantless entry into the home was unlawful. *Id.*  In rejecting the argument, the Fifth Circuit noted that an exception to this rule existed where "law enforcement officers . . . enter a home without a warrant to render emergency assistance to an injured occupant or to protect an occupant from imminent injury." *Id.* at 388–89 (quoting *Brigham City v. Stuart*, 547 U.S. 398, 403 (2006)).  The appellate court then explained:

> In this case, the officers had received a credible report of domestic violence and were entitled to enter Ceasar's apartment to protect his girlfriend—who was eight months pregnant—from potential harm. [*See, e.g., United States v. Martinez*, 406 F.3d 1160, 1164–65 (9th Cir. 2005); *Tierney v. Davidson*, 133 F.3d 189, 197 (2d Cir. 1998) ("Courts have recognized the combustible nature of domestic disputes, and have accorded great latitude to an officer's belief that warrantless entry was justified by exigent circumstances when the officer had substantial reason to believe that one of the parties to the dispute was in danger.").] Once inside the apartment, the officers had probable cause to arrest Ceasar based upon this same credible report of domestic violence. Whether alleged under federal or Louisiana state law, probable cause defeats a claim of false arrest. [(citation omitted)].

*Id.* at 389 & n.3.

Here, Defendant maintains that, with the door open, Vinson could have determined if anyone was harmed or if the couple was yelling, but Defendant's position ignores key facts. Specifically, as found above, Vinson (1) heard about a 911 call claiming a domestic emergency, (2) encountered a woman on the street claiming violence was taking place, (3) heard loud shouting from his car, and (4) could not be certain that the situation might not quickly escalate and result in harm to one or both of them.    Considering these facts, *Ceasar* is strong authority for the Government that Vinson and Sanchez were reasonable in entering to try to calm the situation, particularly given the "combustible nature of domestic disputes" and the "great latitude" given to officers in such situations.

Defendant's other authority does not entitle him to relief either.  For instance, in *Payton v. New York*, the Supreme Court held that "the Fourth Amendment . . . prohibits the police from making a warrantless and nonconsensual entry into a suspect's home in order to make a routine felony arrest." *Id.*, 445 U.S. at 576.  In reviewing the two cases addressed in the opinion, the Supreme Court specifically said that it was not addressing the exigent circumstances exception:

> Before addressing the narrow question presented by these appeals, we put to one side other related problems that are *not* presented today. Although it is arguable that the warrantless entry to effect Payton's arrest might have been justified by exigent circumstances, none of the New York courts relied on any such justification. The Court of Appeals majority treated both *Payton's* and *Riddick's* cases as involving routine arrests in which there was ample time to obtain a warrant, and we will do the same. Accordingly, we have no occasion to consider the sort of emergency or dangerous situation, described in our cases as "exigent circumstances," that would justify a warrantless entry into a home for the purpose of either arrest or search.

*Id.* at 582–83.

Defendant tries to argue that this case too involved "routine arrests" like in *Payton*, but that

is a stretch. *Payton* involved officers going to defendant's house to arrest him, forcibly entering after observing lights and music coming from the apartment and discovering shell casings in plain view that were later used at trial. *Id.* at 576–77. The other case, *Riddick*, involved officers going to a suspect's house, knocking on the door, seeing him on the bed after someone answered, then entering to arrest him and finding weapons, drugs, and drug paraphernalia in a nearby chest of drawers. *Id.* at 578. The instant facts are too different from this for *Payton* to be of much utility, particularly since *Payton* specifically declined to say definitively whether the exigent circumstances exception would have applied.

Lastly, Defendant points to *Kentucky v. King*, but this case too has limited utility. *King* stands for the proposition that the "exigent circumstances rule applies when the police do not gain entry to premises by means of an actual or threatened violation of the Fourth Amendment." 563 U.S. at 469. That is, where "the police did not create the exigency by engaging or threatening to engage in conduct that violates the Fourth Amendment, warrantless entry to prevent the destruction of evidence is reasonable and thus allowed." *Id.* at 462. There, the High Court held, "Because the officers in this case did not violate or threaten to violate the Fourth Amendment prior to the exigency, we hold that the exigency justified the warrantless search of the apartment." *Id.* at 472. Indeed, the Supreme Court specifically assumed an exigency existed, *id.*, and said, "Any question about whether an exigency actually existed is better addressed by the Kentucky Supreme Court on remand," *id.* at 471. Thus, *King* does not save Defendant.

Again, "exigent circumstances exist when there is a genuine risk that officers or innocent bystanders will be endangered . . . if entry is delayed until a warrant can be obtained." *Menchaca-Castruita*, 587 F.3d at 289 (citing *Blount*, 123 F.3d at 837).

> The exigent circumstances analysis focuses upon the reasonableness
> of the officers' investigative tactics leading up to the warrantless

> entry. Our purpose is *not* to examine each act in isolation and inquire whether the officers *could* have acted differently. If "reasonable minds may differ" the courts should not second-guess the judgment of experienced law enforcement officers concerning the risks of a particular situation.

*Blount*, 123 F.3d at 838 (quoting *Howard*, 106 F.3d at 76). "The calculus of reasonableness must embody allowance for the fact that police officers are often forced to make split-second judgments—in circumstances that are tense, uncertain, and rapidly evolving." *King*, 563 U.S. at 466 (quoting *Graham*, 490 U.S. at 396–97).

Considering this standard, the Court concludes that Vinson and Sanchez were reasonable in entering Defendant's residence to defuse the situation and that they committed no Fourth Amendment violation. This part of Defendant's motion is denied.

### 2. The Franks *Standard*

#### a. Applicable Law

"The bulwark of Fourth Amendment protection, of course, is the Warrant Clause, requiring that, absent certain exceptions, police obtain a warrant from a neutral and disinterested magistrate before embarking upon a search." *Franks v. Delaware*, 438 U.S. 154, 164 (1978). The Amendment itself provides in relevant part that "no Warrants shall issue, but upon probable cause, supported by Oath or affirmation[.]" U.S. Const. amend. IV.

"Review of . . . a motion to suppress evidence discovered pursuant to a search warrant is a two-step process." *United States v. Sibley*, 448 F.3d 754, 757 (5th Cir. 2006) (citing *United States v. Cherna*, 184 F.3d 403, 407 (5th Cir. 1999)). First, the Court "decide[s] whether the good-faith exception to the exclusionary rule applies." *Id.* (citing *Cherna*, 184 F.3d at 407). "The good-faith exception provides that where probable cause for a search warrant is founded on incorrect information, but the officer's reliance upon the information's truth was objectively reasonable, the

evidence obtained from the search will not be excluded." *Id.* (citing *United States v. Cavazos,* 288 F.3d 706, 709 (5th Cir. 2002)). "If the good-faith exception applies, [the Fifth Circuit will] affirm the district court's denial of the motion to suppress." *Id.* (citing *Cherna,* 184 F.3d at 407). However, "[t]he good-faith exception does not apply when," among other situations, "the magistrate issuing the warrant was misled by information in an affidavit that the affiant knew or should have known was false . . . ." *Id.* (citing *Cherna*, 184 F.3d at 407–08). "If the good-faith exception does not apply, we proceed to the second step, ensuring that the magistrate issuing the warrant had a substantial basis for concluding that probable cause existed." *Id.* at 757–58 (citing *Cherna*, 184 F.3d at 407).

"When the Fourth Amendment demands a factual showing sufficient to comprise 'probable cause,' the obvious assumption is that there will be a *truthful* showing." *Franks*, 438 U.S. at 164–65 (cleaned up). "Truthful" is meant "in the sense that the information put forth is believed or appropriately accepted by the affiant as true." *Id.* at 165.

*Franks* "set[s] out the legal principles that govern how courts are to address a defendant's allegations of false statements in warrant affidavits[.]" *United States v. Looney*, 532 F.3d 392, 394 (5th Cir. 2008) (per curiam). In *Franks*, the Supreme Court reversed the Supreme Court of Delaware, which had held, that "a defendant under *no* circumstances may so challenge the veracity of a sworn statement used by police to procure a search warrant." 438 U.S. at 155. The *Franks* court held:

> [W]here the defendant makes a substantial preliminary showing that a false statement knowingly and intentionally, or with reckless disregard for the truth, was included by the affiant in the warrant affidavit, and if the allegedly false statement is necessary to the finding of probable cause, the Fourth Amendment requires that a hearing be held at the defendant's request. In the event that at that hearing the allegation of perjury or reckless disregard is established by the defendant by a preponderance of the evidence,

> and, with the affidavit's false material set to one side, the affidavit's remaining content is insufficient to establish probable cause, the search warrant must be voided and the fruits of the search excluded to the same extent as if probable cause was lacking on the face of the affidavit.

*Id.* at 155–56; *see also Sibley*, 448 F.3d at 758 ("the Fourth Amendment requires that the district court hold a hearing . . . (1) if a defendant makes a substantial preliminary showing that a false statement was included by the affiant in the warrant affidavit either knowingly and intentionally, or with reckless disregard for the truth, and (2) if the allegedly false statement is necessary to a finding of probable cause" (citing, *inter alia*, *Franks*, 438 U.S. at 155–56)).

Thus, the Fifth Circuit "will not uphold an officer's good faith reliance on a warrant if 'the issuing-judge "was misled by information in an affidavit that the affiant knew was false or would have known was false except for his reckless disregard of the truth . . . ." ' " *United States v. Gallegos*, 239 F. App'x 890, 894–95 (5th Cir. 2007) (quoting *United States v. Gibbs*, 421 F.3d 352, 358 (5th Cir. 2005)). "In evaluating this argument," the Fifth Circuit "appl[ies] the standard from *Franks* . . . , which requires a defendant to show that '(1) allegations in a supporting affidavit were deliberate falsehoods or made with a reckless disregard for the truth, and (2) the remaining portion of the affidavit is not sufficient to support a finding of probable cause.' " *Id.* at 895 (quoting *United States v. Mays*, 466 F.3d 335, 343 (5th Cir. 2006)).

### b.  Analysis

Having carefully considered the matter, the Court will deny Defendant's motion.  Again, the Application for Search Warrant was based on (a) the smell of marijuana coming from the residence, and (b) the "two digital scales and box of plastic bags with a plastic bag hanging out of the box with the corner torn off," which, based on the officer's "experience[,] is commonly used

in the distribution of narcotics" and which was "observed in plain view on the kitchen counter[.]" (U.S. Ex. 2 at 1.)

The Court finds that, even if the narcotics officers lied about being able to see the scales and bags in plain view, the warrant application still supported a finding of probable cause. Specifically, Vinson testified that he smelled the strong odor of marijuana coming from the house and saw digital scales in the kitchen with white resident and a torn baggie. (HM Tr. at 43.) Again, the Court found his testimony highly believable, particularly since he freely admitted he did not know whether he saw these items before or after entry. (*See id.* at 54). Moreover, the smell of marijuana was corroborated by the narcotics officers on the scene. (*Id.* at 68, 86.)

The Court agrees with the Government that *United States v. Thurman* is persuasive. There, police officers came to defendant's apartment based on certain information and "detected an odor of marijuana wafting from the apartment." *United States v. Thurman*, No. 21-30450, 2022 WL 2805147, at *1 (5th Cir. July 18, 2022), *cert. denied*, 143 S. Ct. 750 (2023). "Alarmed by [defendant's] nervousness, evasive answers, and the possibility that others remained in the apartment," the officers conducted a protective sweep and discovered an AK-47 assault rifle, a baggie of marijuana, and digital scales. *Id.*

Officers applied for a search warrant. *Id.* "The application stated, in relevant part, that 'a protective sweep of the apartment was performed[ ]' '[d]ue to the chance of someone else being in the apartment and them being armed with a rifle[.]' " *Id.* The warrant was signed, and more drugs, drug paraphernalia, the AK-47, and ammunition were found. *Id.*

Defendant was indicted for being a felon in possession and moved to suppress the evidence. *Id.* The magistrate judge held the hearing and recommended that the motion be denied because, though the sweeps were unconstitutional, the officers would have obtained a warrant "based on

16

the independent-source exception to the exclusionary rule." *Id.* The district court denied the motion but found the sweep valid. *Id.*

The Fifth Circuit found the sweeps were constitutionally valid, but, relevant here, the appellate court also affirmed the lower court's conclusion that, "Even if the sweeps were invalid, . . . once [the officer] perceived the odor of marijuana, 'all of the evidence sought to be suppressed would have been discovered pursuant to an independent source[ ] sufficient to withstand exclusion of the evidence. . . ." *Id.* at *5–6.  The Fifth Circuit explained:

> The independent source exception to the exclusionary rule "allows trial courts to admit evidence obtained in an unlawful search if officers independently acquired it from a separate, independent source." *Utah v. Strieff*, 579 U.S. 232, 238 [ ] (2016) (citation omitted). To determine whether lawful searches and seizures are genuinely independent of earlier tainted ones, we must assess whether "the expurgated warrant affidavit provided probable cause for the issuance of the warrant by the magistrate judge[ ]" and "whether the illegal search *affected* or *motivated* the officers' decision to procure the search warrant." *United States v. Restrepo*, 966 F.2d 964, 966 (5th Cir. 1992) [ ] (citing *Murray v. United States*, 487 U.S. 533 [ ] (1987) (emphasis in original)). We review determinations respecting the first consideration *de novo* and those regarding the second for clear error. *United States v. Hassan*, 83 F.3d 693, 697 (5th Cir. 1996).

*Id.* at *5.

As to the first requirement, the Court found this was met because, (1) the officer who prepared the search warrant affidavit "included only a single sentence referring to anything observed during the protective sweep and only mentioned contraband observed in plain view;" (2) the district court accepted the affiant officer's testimony that he smelled marijuana, which "finding . . . heavily weighted in the government's favor;" and (3) "[d]istinctive odors, detected by those qualified to know them, may alone establish probable cause." *Id.* (cleaned up). "Thus, excluding

the single sentence related to the protective sweeps, the search warrant's reference to the smell of marijuana emitting from the unit supported probable cause." *Id.* (cleaned up).

Likewise, here, the plain view statement was a single sentence, and the Court credits the officers' assessment that there was the distinctive odor of marijuana coming from the house. Thus, for the same reasons as in *Thurman*, the Court finds the first requirement met.

As to the second, again, the key is "whether the illegal search *affected* or *motivated* the officers' decision to procure the search warrant." *Id.* at *5. As *Thurman* explains, "[t]he more subjective second consideration about the officers' motivation concerns the precise nature of the information acquired during the illegal search and the relative probative import of this information compared to all other information known to the officers." *Id.* at *6 (cleaned up). On this point, the Fifth Circuit concluded:

> In sum, the record fairly shows that Schmitz catalyzed the search warrant application without ever entering the unit, and [the officer who performed the sweep's] involvement in submitting a warrant application was nil. Finally, the application itself focuses on the smell of marijuana, with a mere mention of items inside the apartment. We cannot form a definite and firm conviction that the district court clearly erred by determining that the government satisfied the second consideration. *See United States v. Cabrera*, 288 F.3d 163, 168 (5th Cir. 2002) (internal quotation marks and citations omitted). The independent source doctrine thus independently would bar application of the exclusionary rule.

*Id.*

Here, the Court finds that the second requirement is satisfied as well. Even if the narcotics officers performed an illegal search to see the scales and baggies, any information they obtained to see this would have been identical to the information already obtained by Vinson when he lawfully entered the residence. (HM Tr. at 43.) Thus, the narcotic officers' information would not affect or motivate the decision to obtain the warrant; indeed, it would be relatively unimportant

compared to the initial, lawful information obtained by Vinson. Further, again, the warrant application focuses equally on, on the one hand, the scales and baggies, and, on the other, the odor of marijuana, which, again, provided an independent basis by itself for the search. (*See* U.S. Ex. 2.) Under these circumstances, the Court finds that the independent source doctrine bars the application of the exclusionary rule.

Defendant complains about a lack of foundation for the officers knowing what marijuana smells like, but the Court does not find this testimony speculative. Rather, the Court finds that it is reasonable to infer that Vinson would know what marijuana smells like, given his being a sergeant working uniform patrol with eight years' experience with the IPSO. (HM Tr. at 32–33.) Likewise, again, Vinson's smelling of marijuana is supported by the narcotics officers' testimony, who did smell marijuana, (*id.* at 68 86), and who, as narcotics officers for four and five years, would certainly know what it smells like, (*id.* at 66, 84.) All of this establishes probable cause to support the search.

For all these reasons, the Court finds that Defendant failed to satisfy his burden under *Franks* and that the independent source doctrine applies. Consequently, the *Home MTS* must be denied.

### III.  THE VEHICLE MTS

#### A.  Relevant Factual Background

The basic facts are simple. On April 26, 2019, Defendant was driving his white pickup truck south on LA Hwy 1 when Deputy Matthew Dixon initiated a traffic stop. (VM Tr. at 14–15.) Defendant was unaware he was being surveilled by federal and state agents and was the subject of a federal wiretap investigation into alleged drug-trafficking activities. (*Id.* at 12–13, 34–35, 41, 50–52, 56–60.) Officers believed Jackson was "coming back from a location that purported to

have drugs on him at that time." (*Id.* at 13; *see also id.* at 24, 34–35, 51–53, 56–60.)

At the stop, Dixon advised Defendant that he observed the taillights and brake lights of the truck to be malfunctioning. (*See id.* at 14.) Dixon also claimed that he "detected a strong odor of burnt marijuana emitting from the vehicle." (*Id.* at 15; *see also id.* at 16, 20, 25, 29, 35.) Dixon testified that, when he asked Defendant about the smell, Defendant admitted he had " 'smoked a blunt earlier.' " (*Id.* at 17, 25.) Defendant was not physically restrained or threatened when he made that statement. (*Id.* at 17, 37.) Further, Dixon said the "smell of burnt marijuana was pretty strong from the vehicle;" while he could not locate any of it, "with how strong the marijuana smell was[,] it just led [him] to believe there was something more in there [he] just wasn't able to find." (*Id.* at 23–24.)

According to Dixon, he asked Defendant for permission to search the vehicle, and Defendant verbally consented. (*Id.* at 18, 20, 30.) Dixon testified that Defendant was unrestrained and "very cooperative during that time." (*Id.* at 17, 20, 37–38.) However, Dixon never told Defendant that he was "free to go," (*id.* at 27–28), and he did not tell Defendant that he had the right not to consent to the search of his truck, (*id.* at 28). Defendant was also not *Mirandized* at that point. (*Id.*)

No evidence of contraband was found in Defendant's truck. (*Id.* at 21.) Dixon then called Sgt. Daniel Falcon and Detective Michael Moore. (*Id.*) When Moore and Falcon arrived, they told Defendant they could "smell marijuana emitting from the inside of the vehicle." (*Id.* at 36; *see also id.* at 42–43.) Falcon asked Defendant if they could further search his truck. (*Id.* at 22, 30, 32, 36–37.) The Government's witnesses maintain that Defendant consented again and that at no point did he tell the officers to stop searching or deny permission to search the vehicle. (*Id.* at 22, 40.) Further, Moore testified that Defendant was not physically restrained or threatened, and he

received no promises related to the search. (*Id.* at 37.)   Moore said Defendant was "very cooperative" and "didn't seem defensive or anything like that." (*Id.* at 38.)  He was also not "under formal arrest or under handcuffs or any formal kind of restraints[.]" (*Id.*)  Defendant disputes this version of events.

In any event, Falcon and Moore then searched the truck. (*Id.* at 22–23, 38.)  The officers found a baggie containing cocaine in a boot lodged between the cab and the bed of the truck. (*Id.* at 22–23, 38.)

### B.  Parties' Arguments

As with the last motion, the Court thoroughly reviewed the briefs with these motions, but the basic positions of the parties can be summarized as follows.  The Government maintains: (1) there was reasonable suspicion to initiate the traffic stop based on Defendant's broken taillight, (Doc. 191 at 1–2); (2) Defendant consented to the search of his vehicle, and, though he was not advised of his right not to consent, that is only one of many factors to consider, most of which weigh toward a knowing and voluntary consent, (*id.* at 4–5); and (3) even if there was no consent, there was probable cause to search based on (a) the smell of marijuana, which justifies a search of all compartments which could contain marijuana, and (b) the prior surveillance of Defendant's drug trafficking activities, (*id.* at 2–4).

On the other hand, Defendant contends: (1) Dixon lacked reasonable suspicion to initiate the stop because parts of the video show the rear lights working, (Doc. 203 at 8); (2) Defendant did not give voluntary consent to search because he was never *Mirandized* or advised of his right to refuse, and this is an important factor to consider, (*id.* at 9–10; *see also* Doc. 208 at 1–2); and (3) there was no probable cause to search because (a) there was no odor of marijuana coming from the bed of the vehicle (i.e., where the drugs were found), (Doc. 208 at 2–3, 5); (b) the officers'

testimony was filled with inconsistencies and contradictions, (*id.*); and (c) evidence of the prior drug activities was not properly supported and authenticated, (Doc. 203 at 8–9; Doc. 206 at 4–5).

### C. Discussion

The *Vehicle MTS* turns on the following issues: (1) Did Dixon have reasonable suspicion to initiate the traffic stop? (2) Did Defendant provide lawful consent to search his vehicle, and (3) Assuming there was no lawful consent, was there probable cause to search? Having carefully considered the matter, the Court answers each of these questions in the affirmative. The Court will take each issue in turn.

#### *1. General Principles*

"The Fourth Amendment guarantees that '[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated." *United States v. Hunt*, 253 F.3d 227, 230 (5th Cir. 2001) (quoting U.S. Const. amend. IV). "The essential purpose of the Fourth Amendment is to impose a standard of 'reasonableness' upon law enforcement agents and other government officials in order to prevent arbitrary invasions of the privacy and security of citizens." *Id.* (citing *Delaware v. Prouse*, 440 U.S. 648, 653–654 (1979)). Accordingly, "the Supreme Court has determined that warrantless searches and seizures are per se unreasonable unless they fall within a few narrowly defined exceptions." *United States v. Cardenas*, 9 F.3d 1139, 1147 (5th Cir. 1993) (citing *Coolidge v. New Hampshire*, 403 U.S. 443, 454–55 (1971)).

"While in general, on a motion to suppress, the defendant has the burden of proving, by a preponderance of the evidence, that the material in question was seized in violation of his constitutional rights, there are several situations where the burden shifts to the government." *United States v. Roch*, 5 F.3d 894, 897 (5th Cir. 1993) (citing *United States v. De*

*La Fuente*, 548 F.2d 528, 533 (5th Cir. 1977)).  The Fifth Circuit has stated that one situation in which the burden shifts to the Government is when a defendant shows that he was subject to search without a warrant. *Id.* (citing *De La Fuente*, 548 F.2d at 533). Consequently, because it is undisputed that Defendant was subject to a warrantless search, the Government bears the burden of proving by a preponderance of the evidence the legality of the stop and the warrantless search. *See United States v. Matlock*, 415 U.S. 164, 177 n.14 (1974).

### 2. Reasonable Suspicion

#### a. Applicable Law

Traffic stops are considered seizures within the meaning of the Fourth Amendment. *Prouse*, 440 U.S. at 653. However, because a routine traffic stop tends to be "a relatively brief encounter," it is considered "more analogous to a so-called *'Terry* stop' . . . than to a formal arrest." *Knowles v. Iowa*, 525 U.S. 113, 117 (1998) (quoting *Berkemer v. McCarty*, 468 U.S. 420, 439 (1984) (citing *Terry v. Ohio*, 392 U.S. 1 (1968))). *See also Arizona v. Johnson*, 555 U.S. 323, 330 (2009).

Thus, courts must analyze the legality of a traffic stop under the two-part test articulated in *Terry*, which asks "whether the officer's action was: (1) justified at its inception; and (2) reasonably related in scope to the circumstances which justified the interference in the first place." *United States v. Lopez-Moreno*, 420 F.3d 420, 430 (5th Cir. 2005) (quoting *Terry*, 392 U.S. at 19–20); *see also United States v. Berry*, 664 F. App'x 413, 418 (5th Cir. 2016) (per curiam).

"For a traffic stop to be justified at its inception, an officer must have an objectively reasonable suspicion that some sort of illegal activity, such as a traffic violation, occurred, or is about to occur, before stopping the vehicle." *Lopez-Moreno*, 420 F.3d at 430 (citing *United States v. Breeland*, 53 F.3d 100, 102 (5th Cir. 1995)). "To pass muster, [the officer's]

suspicion must have been based on specific and articulable facts and not mere hunches." *United States v. Martinez*, 808 F.2d 1050, 1054 (5th Cir. 1987) (citing *United States v. Cortez*, 449 U.S. 411, 417–18 (1981); *Terry*, 392 U.S. at 21). Additionally, the Court "must gauge those facts not individually, but in their totality and as seen and interpreted by officers of [Dixon's] experience." *Id.* (citations omitted).

<em>b.</em>  <u>Analysis</u>

Having carefully considered the matter, the Court finds that Dixon had reasonable suspicion to initiate the stop. Specifically, he testified that he followed Dixon and noticed that the taillights and brake lights were out. (VM Tr. 14.) The Court listened to Dixon's testimony and observed his demeanor, and the Court found this testimony credible. Thus, Dixon had reasonable suspicion that the truck's back lights were malfunctioning in violation of La. R.S. § 32:319(A), so Dixon had reasonable grounds for the stop.

Defendant complains that, at one point in the video, the right-side brake lights are working, but Defendant's position is undermined by two points. First, the fact that one brake light worked in one part of the video does not gainsay the possibility that the other malfunctioned, or that both malfunctioned at a different point in time. Second, in the video, Defendant admits that he got into a wreck, that he has had all kinds of problems with his car, and that his lights were working before the wreck. (U.S. Ex. 6b at 7:32–8:03.) Both of these points support Dixon's testimony that the back lights were in fact malfunctioning at the moment Dixon initiated the stop. Thus, this part of Defendant's motion is denied.

<strong><em>3. Consent to Search</em></strong>

<em>a.</em>  <u>Applicable Law</u>

Consent is "one of the specifically established exceptions to the requirements of both a

24

warrant and probable cause." *Schneckloth v. Bustamonte*, 412 U.S. 218, 219 (1973); *United States v. Jenkins*, 46 F.3d 447, 451 (5th Cir. 1995). In order to demonstrate valid consent, the government must establish by a preponderance of evidence that the consent was voluntary. *United States v. Hurtado*, 905 F.2d 74, 76 (5th Cir. 1990) (en banc).

Additionally, "[a] subsequent consent to search may, but does not necessarily, dissipate the taint of a prior Fourth Amendment violation." *United States v. Macias*, 658 F.3d 509, 522 (5th Cir. 2011) (quoting *United States v. Jones*, 234 F.3d 234, 242 (5th Cir.2000) (internal quotation marks and alterations omitted)). As the Fifth Circuit has stated:

> When we analyze consent given after an unconstitutional detention, a two-pronged inquiry is applied: (1) whether the consent was voluntarily and freely given; and (2) whether the consent was an independent act of free will. *Jones*, 234 F.3d at 242. "The first prong focuses on coercion, the second on causal connection with the constitutional violation." *United States v. Chavez–Villarreal*, 3 F.3d 124, 127 (5th Cir. 1993). We have made clear that affirmance for the Government on such consent as here is appropriate only if *both* questions are answered favorable to it: "Even though voluntarily given, consent does not remove the taint of an illegal detention if it is the product of that detention and not an independent act of free will." *Id.* at 127–28. Furthermore, the Government "has the burden of proving, by a preponderance of the evidence, that the consent was voluntary." *Jones*, 234 F.3d at 242 (internal quotation marks omitted).

*Id.* at 522–23.

The Fifth Circuit has set forth the following non-exclusive factors to be used in determining whether consent is voluntary:

> (1) the voluntariness of the defendant's custodial status; (2) the presence of coercive police procedures; (3) the extent and level of the defendant's cooperation with the police; (4) the defendant's awareness of his right to refuse to consent; (5) the defendant's education and intelligence; and (6) the defendant's belief that no incriminating evidence will be found.

*United States v. Rounds*, 749 F.3d 326, 338 (5th Cir. 2014) (citing *Jones*, 234 F.3d at 242). "No single factor is dispositive," *id.*, and that the issue of whether consent was voluntary "is a question of fact to be determined from the totality of all the circumstances." *Schneckloth*, 412 U.S. at 227. The Government's "burden cannot be discharged by showing no more than acquiescence to a claim of lawful authority." *Rounds*, 749 F.3d at 338 (citing *Jenkins*, 46 F.3d at 451).

With respect to whether consent is an independent act of free will, courts in this circuit consider: "(1) the temporal proximity of the illegal conduct and the consent; (2) the presence of intervening circumstances; and (3) the purpose and flagrancy of the initial misconduct." *United States v. Ansourian*, 487 F. App'x 155, 158 (5th Cir. 2012) (per curiam) (citing *United States v. Jenson*, 462 F.3d 399, 407 (5th Cir. 2006) (citations omitted)).

### b. Consent to Search

Having carefully considered the matter, the Court finds that Defendant consented to the search of his vehicle. Dixon and Moore both testified that Defendant consented to the search. (VM Tr. 18, 20, 36.) Moreover, both said that, at the time of consent, Defendant was not physically restrained and, based on their experience, "very cooperative." (*Id.* at 20, 38.) Further, Defendant was not under the influence of any drugs or alcohol. (*Id.* at 21.) Defendant was not threatened, and he received no promises related to the search. (*Id.* at 37.) At no point did Defendant tell the officers to stop searching the vehicle or otherwise deny permission to search, and he was not "under formal arrest or under handcuffs or any formal kind of restraints." (*Id.* at 22, 38.)

The Court heard all of this testimony and observed the demeanor of the testifying officers, and the Court found them to be highly credible. Moreover, their testimony was consistent with the interactions between Defendant and the police captured on the video. (*See* U.S. Ex. 6.) For all these reasons, the Court finds that the consent was voluntarily and freely given and an independent

act of free will. *See Ansourian*, 487 F. App'x at 158–59 (finding no error in district court's determination that consent was an independent act of free will in part (a) because the "officers did not purposefully use th[e] period of illegal detention to procure the defendant's consent to search the vehicles;" (b) because "consent was not obtained by any misrepresentations to the defendants . . . ;" and (c) because "once the search began, [defendant] never tried to stop it, revoke his consent, or complain about the length of the search").

Defendant complains that Defendant was not informed of his right to refuse consent, but that does not entitle Defendant to relief. Defendant is correct that one factor in the analysis is "the defendant's awareness of his right to refuse consent[.]" *Rounds*, 749 F.3d at 338. But this is but one of the many factors listed above. *See id.* Indeed, as the Government notes, the Supreme Court has specifically held that this factor is not dispositive in the analysis. *See Ohio v. Robinette*, 519 U.S. 33, 35 (1996) ("We are here presented with the question whether the Fourth Amendment requires that a lawfully seized defendant must be advised that he is 'free to go' before his consent to search will be recognized as voluntary. We hold that it does not."). The High Court specifically stated:

> We have previously rejected [such] a *per se* rule . . . in determining the validity of a consent to search. In *Schneckloth v. Bustamonte,* 412 U.S. 218 [ ] (1973), it was argued that such a consent could not be valid unless the defendant knew that he had a right to refuse the request. We rejected this argument: "While knowledge of the right to refuse consent is one factor to be taken into account, the government need not establish such knowledge as the *sine qua non* of an effective consent." *Id.,* at 227 [ ]. And just as it "would be thoroughly impractical to impose on the normal consent search the detailed requirements of an effective warning," *id.,* at 231 [ ], so too would it be unrealistic to require police officers to always inform detainees that they are free to go before a consent to search may be deemed voluntary.

> The Fourth Amendment test for a valid consent to search is that the consent be voluntary, and "[v]oluntariness is a question of fact to be determined from all the circumstances," *id.,* at 248–249 [ ].

*Id.* at 39–40. Thus, while this one factor weighs in Defendant's favor, the others are either neutral (such as "(5) the defendant's education and intelligence; and (6) the defendant's belief that no incriminating evidence will be found") or weigh strongly in the Government's favor (such as "(2) the presence [(or, here, absence)] of coercive police procedures; [and] (3) the extent and level of the defendant's cooperation with the police"). *Id.*

For all these reasons, the Court finds that Defendant knowingly and voluntarily consented to the search of his vehicle. As a result, the search was valid, and Defendant's motion must be denied.

### *4. Probable Cause*

#### *a.* Applicable Law

"Probable cause to search an automobile exists where 'trustworthy facts and circumstances within the officer's personal knowledge would cause a reasonably prudent man to believe that the vehicle contains contraband'." *United States v. Castelo*, 415 F.3d 407, 412 (5th Cir. 2005) (quoting *United States v. Edwards*, 577 F.2d 883, 895 (5th Cir. 1978) (en banc)). "A determination of probable cause is also based on the totality of circumstances and must be predicated on more than a 'bare suspicion.' " *United States v. Guerra*, 605 F. App'x 295, 297 (5th Cir. 2015) (per curiam) (citing *United States v. Banuelos-Romero*, 597 F.3d 763, 767 (5th Cir. 2010)). However, "if, under the totality of the circumstances, officers have probable cause to believe that a vehicle contains contraband, they are authorized to search [it] without a warrant." *United States v. Sinisterra*, 77 F.3d 101, 105 (5th Cir. 1996) (citations omitted).

Again, "[p]robable cause determinations are not to be made on the basis of factors

considered in isolation, but rather on the totality of the circumstances." *United States v. Reed*, 882 F.2d 147, 149 (5th Cir. 1989) (citing *Illinois v. Gates*, 462 U.S. 213 (1983)). " '[P]robable cause is the sum total of layers of information' available to law enforcement officials." *Id.* (quoting *Edwards*, 577 F.2d at 895). "The factors relevant to probable cause are not technical ones, but rather 'factual and practical ones of everyday life on which reasonable and prudent persons, not legal technicians, act.' " *Id.* (quoting *United States v. Tarango–Hinojos*, 791 F.2d 1174, 1176 (5th Cir. 1986)). "Furthermore, a 'trained officer draws inferences and makes deductions . . . that might well elude an untrained person,' and evidence collected 'must be seen and weighed not in terms of library analysis by scholars, but as understood by those versed in the field of law enforcement.' " *Id.* (citing *Cortez*, 449 U.S. 411). Ultimately, "[w]hether an officer has probable cause to search a vehicle depends on the totality of the circumstances viewed 'in light of the observations, knowledge, and training of the law enforcement officers involved in the warrantless search.' " *United States v. McSween*, 53 F.3d 684, 686 (5th Cir. 1995) (quoting *United States v. Muniz–Melchor*, 894 F.2d 1430, 1438 (5th Cir. 1990)).

Additionally, the law in the Fifth Circuit is clear: if officers smell marijuana coming from inside the vehicle, they have probable cause to search the vehicle. *See United States v. Lork*, 132 F. App'x 34, 35-36 (5th Cir. 2005) (per curiam) (holding that, after conducting lawful traffic stop for speeding, officer detected odor of marijuana emanating from defendant's vehicle, thereby creating probable cause to search vehicle); *United States v. Paul*, No. 16-131, 2017 WL 2200908, at *7 (M.D. La. May 19, 2017) (deGravelles, J.) ("the smell of marijuana gave the officers probable cause to search the entire vehicle." (citation omitted)); *United States v. Henry*, No. 15-26, 2015 WL 6479029, at *4 (M.D. La. Oct. 27, 2015) (deGravelles, J.), *aff'd*, 853 F.3d 754 (5th Cir. 2017) (finding, where officer detected marijuana odor emanating from car after lawful traffic

stop for minor traffic infraction, that odor provided probable cause to search car (citations omitted)).

Additionally, "probable cause permits officers to search 'every part of a vehicle which may conceal the object of the search,' " including "illegal narcotics." *Berry*, 664 F. App'x at 421 (quoting *United States v. Zucco*, 71 F.3d 188, 191–92 (5th Cir. 1995)); *see also Paul*, 2017 WL 2200908, at *8 ("In sum, once the officers smelled marijuana, they had probable cause to search the entire vehicle, including anywhere that they believed contraband could be hidden. Thus, the search of the entire vehicle, including the closed compartment near the steering wheel, was permissible.").

### *b.* Analysis

Having carefully considered the matter, the Court also finds that, even if Defendant did not lawfully consent to the search, the officers had probable cause to search based on the odor of marijuana coming from the vehicle. Both Dixon and Moore testified that they smelled the burnt marijuana. (VM Tr. 15–16, 20, 25, 29, 35–36, 42–43.) Indeed, Dixon said the "smell of burnt marijuana was pretty strong from the vehicle;" while he could not locate any of it, "with how strong the marijuana smell was[,] it just led [him] to believe there was something more in there [he] just wasn't able to find." (*Id.* at 23–24.) Again, the Court found this testimony to be highly credible, even if Defendant had not admitted to smoking a blunt earlier. (*Id.* at 17, 25.)[2] Moreover,

---

[2] The Court also notes that, based on the facts found throughout this opinion, there was no *Miranda* violation. "[A] person detained in a routine traffic stop is not 'in custody' for *Miranda* purposes." *United States v. Reyes*, 963 F.3d 482, 490 (5th Cir. 2020) (citing *Berkemer*, 468 U.S. at 440). "*Miranda* applies only once 'a suspect's freedom of action is curtailed to a degree associated with formal arrest.' " *Id.* (quoting *Berkemer*, 468 U.S. at 440 (quotation marks omitted)). As in *Reyes*, "[b]ecause the traffic stop did not have the quality of a formal arrest, *Miranda* does not apply." *Id.* at 490–91. *See also United States v. Coleman*, 610 F. App'x 347, 353 (5th Cir. 2015) (per curiam) (finding that district court did not err in denying motion to suppress and that no *Miranda* warnings were required in part because (a) "[t]he stop was conducted on the side of a public roadway, where a traffic stop is normally conducted;" (b) the officer "never engaged [defendant] in specific, lengthy or accusatory questioning about any suspected offense;" and (c) defendant "was either sitting in his car or standing outside it, unrestrained, during the entire stop").

the fact that Dixon did not initially find the drugs in his first search is irrelevant, given the rule that probable cause allows officers to search "every part of a vehicle which may conceal the object of the search[.]" *Berry*, 664 F. App'x at 421.  For these additional reasons, the Court finds that the vehicle search was lawful.

IV.    **CONCLUSION**

Accordingly,

**IT IS ORDERED** that the *Motion to Suppress and Evidence* [sic]  (Doc. 120, 187) and the *Second Motion to Suppress Statement and Evidence* (Doc. 147) filed by Defendant Malcolm J. Jackson, a.k.a. "Fish" are **DENIED**.

**IT IS FURTHER ORDERED** that a status conference is set for May 11, 2023, at 9:30 a.m. by zoom to set a trial date and to establish pretrial deadlines.

Signed in Baton Rouge, Louisiana, on May 1, 2023.

_____
**JUDGE JOHN W. deGRAVELLES**
**UNITED STATES DISTRICT COURT**
**MIDDLE DISTRICT OF LOUISIANA**